HEATHER E. WILLIAMS, SBN 122664
Federal Defender
CHRISTINA SINHA, SBN 278893
MEGAN T. HOPKINS, SBN 294141
Assistant Federal Defender
801 I Street, Third Floor
Sacramento, CA 95814
T: (916) 498-5700
F: (916) 498-5710

Attorneys for Defendant
MURAT KURASHEV

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:21-CR-40-KJM |
| | ) | |
| Plaintiff, | ) | **MR. KURASHEV'S SENTENCING** |
| | ) | **MEMORANDUM** |
| vs. | ) | |
| | ) | Date:  April 29, 2024 |
| MURAT KURASHEV, | ) | Time:  9:00 A.M. |
| | ) | Judge: Hon. Kimberly J. Mueller, Chief |
| Defendant. | ) | District Judge |
| | ) | |

## TABLE OF CONTENTS

I.   FACTUAL BACKGROUND ................................................................................ 1

   A.   Tumultuous early life in Russia. .............................................................. 1

   B.   Escape to Germany and return to Russia. ................................................. 2

   C.   Continued persecution in Russia. ............................................................ 3

   D.   Asylum in United States. ....................................................................... 3

   E.   Syrian civil war. ................................................................................... 4

   F.   Involvement with Fayzimatov and instant offense conduct. ....................... 4

II.  LEGAL FRAMEWORK ................................................................................... 6

   A.   18 U.S.C. § 2339B(a)(1). ........................................................................ 6

   B.   The terrorism enhancement at § 3A1.4 should not be applied. ................... 7

      i.   *Section 3A1.4 should not be applied in this case.* ................................ 7

      ii.  *Section 3A1.4 is unreliable.* ............................................................... 8

   C.   Section 2X1.1, not § 2M5.3, should be applied in *attempted* material support for terrorism cases. ................................................................................................... 12

   D.   If § 3A1.4 is applied, the § 4A1.3(b) departure should also be applied. ....... 14

   E.   Applying 18 U.S.C. § 3553(a), a sentence of eight years of incarceration is sufficient, but not greater than necessary. ....................................................................... 16

III. CONCLUSION. ............................................................................................. 19

1

**TABLE OF AUTHORITIES**

2

**Federal Cases**                                                                                           **Page(s)**

3

4

*Rita v. United States,*
   551 U.S. 338 (2007) .................................................... 11

5

*Spears v. United States,*
   129 S. Ct. 840 (2009) ................................................... 11

6

7

*United States v. Alhaggagi,*
   978 F.3d 693 (9th Cir. 2020) .......................................... 7, 8

8

9

*United States v. Aref,*
   2007 U.S. Dist. LEXIS 17926 (N.D.N.Y.) ..................... 16

10

*United States v. Benkahla,*
   501 F.Supp. 2d 748 (E.D. Va. 2007) ............................. 15

11

12

*United States v. Graham,*
   275 F.3d 490 (6th Cir. 2001) ......................................... 10

13

*United States v. Kimbrough,*
   128 S. Ct. 558 (2007) ................................................... 11

14

15

*United States v. Meskini,*
   319 F.3d 88 (2d Cir. 2003) ........................................... 15

16

17

*United States v. Muhtorov,*
   329 F.Supp. 3d 1289 (D. Co. 2018) .............................. 15

*United States v. Nayyar,*
   2013 U.S. Dist. LEXIS 79002 (S.D.N.Y.) ..................... 15

18

19

*United States v. Thurston,*
   2007 U.S. Dist. LEXIS 38185 (D. Or.) .......................... 16

20

21

**Federal Statutes**

22

18 U.S.C. § 2332b(g)(5) ................................................... 7, 8

18 U.S.C. § 2339A ........................................................... 6

23

18 U.S.C. § 2339B ........................................................ *passim*

24

18 U.S.C. § 3553 ............................................. 6, 11, 16, 18, 19

25

26

27

28

1    Mr. Kurashev respectfully submits the following sentencing memorandum in advance of

2    the above-captioned judgment and sentencing hearing.  The defense's formal objections to the

3    presentence report, filed at ECF No. 153, are incorporated herein by reference.  The government

4    did not submit any informal or formal objections to the report.

5                          **I.  FACTUAL BACKGROUND.**

6          **A.    Tumultuous early life in Russia.**

7    Mr. Kurashev was born in the Union of Soviet Socialist Republics ("USSR"), in a region

8    that would eventually become the modern nation-state of Russia, in 1987.  The early years of his

9    life were marked by mass demonstrations, protests, and the general unrest that attended the failing

10   and dissolution of the USSR (which officially occurred on December 26, 1991, a few months after

11   a failed coup).  In the years that followed, life in the nascent country of Russia remained extremely

12   tumultuous and was particularly difficult for Russia's disfavored ethnic and religious minorities.

13   In October 2005, when Mr. Kurashev was 18 years old, a group of Muslim militants raided

14   several buildings utilized by Russian security forces in the Kabardino-Balkar region (an area of

15   Russia around the size of Connecticut that is known to have a significant Muslim population),

16   where Mr. Kurashev was born and raised. Afterwards, the Russian government cracked down on

17   all Muslims in the area.  Mr. Kurashev witnessed and experienced the government's violent

18   response first-hand; many innocent Muslims were detained, tortured, disappeared, and killed,

19   despite having no connection whatsoever to the raiders.  The Russian government occasionally did

20   this under the guise of its investigation of the raid, but in many cases didn't bother with ruse.  The

21   townspeople also targeted their Muslim neighbors, and there was a dramatic rise in Islamophobic

22   hate crimes, including physical attacks, and the mosques emptied as the local Muslim community

23   hid in their homes as much as possible.

24   The Russian federal police (known as the FSB or Federal Security Service, the main

25   successor agency to the USSR's infamous KGB) carried out many of these activities, and even

26   years after the raid, the animus towards the local Muslim community never abated.  Innocent

27   Muslims were routinely targeted by the FSB's anti-terrorism operations.  Despite this climate, Mr.

28   Kurashev remained in the area, as he felt he had nowhere else to go.  He tried to keep his head

Defense Sentencing Memorandum                          *United States v. Murat Kurashev*, 21-40-KJM

1   down and avoid the government's attention.

2   In March of 2011, two of his close friends were detained and killed by the FSB.  A month

3   after their murders, when Mr. Kurashev was walking home, he was abducted by FSB agents and

4   taken to their department.  They interrogated Mr. Kurashev about his murdered friends, as well as

5   about people he did not know.  They asked him where he was on the day of the October 2005 raid.

6   The agents were clearly not interested in his actual answers, as they would ask questions but then

7   immediately resume beating him to the point that he could not speak.

8   Mr. Kurashev eventually passed out from the beatings, but the torture continued once he

9   regained consciousness.  They eventually released him without charging him with anything, but

10  threatened that they would either kill him or put him in prison.  They told him they were following

11  his every step and would continue to do so.

12  Mr. Kurashev's father came to pick him up after he was released by the FSB and rushed

13  him to the hospital; he had been beaten so badly that he *inter alia* suffered a concussion and

14  fractured facial bones, requiring surgery and a metal plate under his left eye to stabilize the bone.

15  After ten days in the hospital, Mr. Kurashev was discharged.  He realized he, his wife Liana (whom

16  he married in 2009 and who was pregnant at the time with their second child), and their son (who

17  was a toddler) needed to flee Russia, or else the FSB would likely carry out their threats.  They

18  fled to Germany, where Liana had some family members, and sought asylum.

19  **B.      Escape to Germany and return to Russia.**

20  Upon arriving in Germany, the family presented themselves to the German authorities.

21  After staying with Liana's family for two weeks, Mr. Kurashev and his family moved to a different

22  town where there was a refugee camp and were subsequently transferred by the German authorities

23  multiple times.  They eventually settled in Germany and got jobs.  Mr. Kurashev worked in

24  construction, and he and Liana had three children by that point.

25  This settled life came to an abrupt halt in 2016, when the German authorities informed the

26  family that the situation in Russia had ameliorated enough for them to return.  Mr. Kurashev

27  petitioned them to let him and his family remain in Germany, and explained how frightened he

28  was to return, but the German authorities insisted that the country conditions in Russia were now

safe enough for Muslims. In February 2018, the family departed Germany for Russia per the German authorities' instructions. Also at their instruction, Mr. Kurashev signed a document promising not to return to Europe for three years.

### C.    Continued persecution in Russia.

About a month after returning to Russia, FSB officers came to their home and interrogated Mr. Kurashev while he and Liana were there alone. They asked detailed questions about where he had been in the intervening years, what mosque he now attended, and a host of other questions. Liana was terrified and called her brother (who lived next door) to come over to be a witness. The agents interrogated Mr. Kurashev for approximately three hours before leaving.

A few months later, FSB agents came and interrogated him again. Seven of them stormed their home, restrained Mr. Kurashev, and searched the entire house. They took Mr. Kurashev to the FSB department and continued interrogating him, including about the 2005 raid, despite having no reason to think that he was involved with the raid (which he was not). They interrogated him for hours and threatened him, saying they would either kill him or find a way to put him in prison.

### D.    Asylum in United States.

After this incident, Mr. Kurashev decided he had no choice but to flee again with his family, as he believed it was only a matter of time before the FSB carried out their threats. He was worried about Liana and their kids and did not want them to continue living in fear, especially since one of his children is especially vulnerable due to his special needs.

Since he had signed a paper promising not to come back to Europe for three years (which is usual in the European Union in these circumstances), and because he was keeping the needs of his autistic child in mind, he went online and researched how to apply for asylum in the United States. He and his family arrived at the U.S. border, declared themselves, and registered pursuant to the asylum protocols. They were put on a bus by the border authorities and arrived in Sacramento on December 19, 2018.

Mr. Kurashev, who had prior experience working in construction, got a job with a construction company working as a general laborer. He was in high demand with his employers because he has experience and expertise working in a wide variety of construction tasks, which

meant his employer could utilize him for many different roles instead of having to search out people with individual expertise in areas such as cabinetry, tile-laying, or other specialized tasks. This work allowed him to support himself, his wife, and their four young children.  He was working full-time with this construction company at the time of his arrest.

### E.    Syrian civil war.

In March 2011, against the backdrop of the larger pro-democracy Arab Spring, popular discontent with the authoritarian government run by Syrian President Bashar al-Assad led to sustained antigovernment protests by the Syrian people that aimed to establish a democracy in Syria.  Maria Petkova, *What has Russia gained from five years of fighting in Syria?*, Al Jazeera (Oct. 01, 2020), *available at* https://www.aljazeera.com/features/2020/10/1/what-has-russia-gained-from-five-years-of-fighting-in-syria; *see also* Imran Rahman-Jones, *Why does Russia support Syria and President Assad?*, BBC (Apr. 11, 2017), *available at* https://www.bbc.com/news/newsbeat-39554171.  Several groups entered the conflict (which continues to this day), some of which were supported by Western countries and others of which were supported or run (partly or wholly) by various terrorist groups.

The authoritarian government of Syria enjoyed the early military assistance of Russia, including weapons, financial aid, and military personnel.  *Id.*  The Russian-backed Syrian government committed war crimes and crimes against humanity against Syrian civilians.  Human Rights Watch, *Syria: Events of 2021*, *available at* https://www.hrw.org/world-report/2022/country-chapters/syria (last visited Apr. 21, 2024).

Today, it is relatively easy to obtain information about these abuses, as well as detailed journalism on the Syrian conflict and the many players therein.  Russia's role in these abuses is likewise simple to discern today.  However, this was not the case in 2020, when Mr. Kurashev began searching for information on the conflict.

### F.    Involvement with Fayzimatov and instant offense conduct.

While searching for information on the Syrian civil war, Mr. Kurashev first came across Farruk Fayzimatov's online materials in 2020.  The two eventually began communicating and Mr. Kurashev ultimately engaged in the conduct he admitted to in the factual basis of the open plea.

1    *See* Section II.C. *infra*.  The defense does *not* dispute that Fayzimatov was conducting many

2    activities besides journalism, nor does the defense dispute that Fayzimatov was *inter alia*

3    fundraising for various anti-Assad groups participating in the conflict, including HTS, which was

4    previously designated by the United States as a terrorist group.

5         However, it is equally true that Fayzimatov held himself out as and highlighted his work

6    as a lay journalist on social media, including in videos that he posted about himself on YouTube.

7    For example, discovery provided by the government includes information about a February 18,

8    2019, video by Fayzimatov where he shares the story of his life in his hometown, where people

9    did not care about Muslims being killed.  In that video, Fayzimatov states that he believed it was

10   his duty to go and help his Muslim brothers in Syria, and that he decided to become a journalist to

11   tell the world what is really going on there since there is so much misinformation.

12        In another example from April 09, 2020, Fayzimatov posted a video announcing a

13   fundraiser for a new camera, stating that media work is important for the truth (about the conflict)

14   coming out.  A month later, on May 24, 2020, he posted a video titled "Report on the equipment

15   purchase with the support of Muslims" that shows media equipment purchased with the money

16   that was raised, including lights, recorders, and cameras.  Around the same time frame, Fayzimatov

17   posted a video discussing what he deemed a serious shortage of media activists who can post about

18   the situation in Syria, particularly because those who were reporting on what was happening were

19   getting blocked online.  His videos have included documentation of villagers killed in aerial

20   bombings by Assad's forces and documented war crimes, such as the Syrian government's use of

21   Sarin gas against civilians.  Joby Warrick, "10 years after deadly chemical attack, Syria's survivors

22   seek justice," Wash. Post, Aug. 21, 2023, *available at* https://www.washingtonpost.com/national-

23   security/2023/08/21/syria-sarin-chemical-weapons-justice/.

24        In short, Mr. Kurashev did not start out with the intent to attempt to provide material

25   support to a terrorist group.  Through his communication with Fayzimatov and consumption of his

26   online content, Mr. Kurashev strayed from his original purpose.  This does not excuse Mr.

27   Kurashev's conduct, and he stands by and reaffirms his guilty plea and accepts responsibility for

28   his conduct; however, his motivation to expose abuses by the Syrian and Russian governments –

the latter of which Mr. Kurashev was personally familiar with, given his torture by the FSB – is a highly relevant factor under 18 U.S.C. § 3553(a) that was not considered by the Guidelines.

### G. Self-reflection, improvement, and study during pretrial incarceration.

In the more than three years since his arrest, Mr. Kurashev has deeply reflected on his conduct, as he will share with the Court during allocution. He has learned why it is wrong to provide support for even a portion of Fayzimatov's work when it was possible that support will also go to groups such as HTS. He has also taken these years to sincerely repent his conduct, such that there is no danger he will never engage in such conduct again, regardless of which country he is eventually deported to following his sentence.

He has also spent these years working hard to improve himself in any way he can, within the constraints of his pretrial incarceration. He continues to support his family emotionally as best he can from behind the jail's walls and has spent the rest of his time taking every educational opportunity available to him. He has taken every course at the Central Valley Annex (where he is currently detained) and was only prevented from doing similar coursework at the Sacramento County Main Jail because of the severe restrictions, extremely limited services, and dire health crisis at that facility during the COVID-19 pandemic. He nonetheless spent his time at the Sacramento Jail self-studying with his limited resources, and was successful in improving his English to the point where undersigned counsel no longer required a Russian interpreter to communicate with him. In short, Mr. Kurashev has done everything he possibly can to grow as a person and to ensure that he never runs afoul of the law again.

## II. LEGAL FRAMEWORK.

### A. 18 U.S.C. § 2339B(a)(1).

There are two United States statutes that criminalize providing material support to terrorist entities: 18 U.S.C. § 2339A & § 2339B. The latter, which Mr. Kurashev pled guilty to, criminalizes attempting to provide or actually providing material support or resources to a foreign terrorist entity. Unlike in § 2339A, the defendant's intention in providing or attempting to provide that support is irrelevant under § 2339B.

Section 2339B, which was first implemented in 1996, initially carried a statutory maximum

term of imprisonment of 10 years.  This was increased to 15 years in 2001, and again in 2015 to the current statutory maximum of 20 years of imprisonment.  This statute has never carried a mandatory minimum sentence of imprisonment.

**B.**    **The terrorism enhancement at § 3A1.4 should not be applied.**

*i.*    *Section 3A1.4 should not be applied in this case.*

The § 3A1.4 adjustment applies in cases where the offense of conviction is a felony that involved, or was intended to promote, a "federal crime of terrorism."  The application notes refer the Court to 18 U.S.C. § 2332b(g)(5) for the definition of that term.  U.S.S.G. § 3A1.4 A.N. 1. The statute defines "federal crime of terrorism" as an "offense that…is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and is an enumerated statute.  18 U.S.C. § 2332b(g)(5).

Since the offense of conviction in this case is an enumerated offense, the question of whether § 3A1.4 applies turns on the first prong, to wit, whether Mr. Kurashev's offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." It is the government's burden to prove that element by clear and convincing evidence, since the application of § 3A1.4 triggers a substantial change in the guidelines that requires this higher standard of proof.  *See United States v. Alhaggagi*, 978 F.3d 693, 700-01 (9th Cir. 2020).

In striking the district court's application of § 3A1.4, the *Alhaggagi* Court held that the district court's analysis must center on the defendant's conduct or mental state, not on the terrorist organization at issue.  *Id*. at 701.  The Court held that, while it is true that any support given to a terrorist organization is ultimately a benefit to its overall terroristic objectives, that reasoning "misses the mark in the context of the terrorism enhancement because it fails to properly differentiate between the intent required to sustain a material support conviction pursuant to 18 U.S.C. §  2339B(a)(1) and the intent required to trigger the terrorism enhancement pursuant to U.S.S.G. § 3A1.4."  *Id*.

The Court went on to differentiate the two, stating:

> As explained above, the material support statute requires only that
> the defendant have "knowledge of the foreign group's designation

1    as a terrorist organization or the group's commission of terrorist
2    acts." Section 3A1.4, in contrast, requires the defendant's specific
     intent that the offense "influence or affect the conduct of
3    government by intimidation or coercion."

4    In cases involving violent acts of terrorism, specific intent is
5    relatively easy to identify, either from the statements or admissions
     of the defendant or the nature of the offense. But, where the conduct
6    underlying the conviction does not involve violent terrorist acts, as
     is true in many material support cases, those "acts cannot, standing
7    alone, support application of the terrorism enhancement."

8    *Id*. at 701-02 (internal citations omitted).

9    Just like the conduct discussed in *Alhaggagi* (opening a social media account for ISIS or

10   serving as a translator for a terrorist organization), providing funding to an individual who, among

11   other things, raises money for a terrorist organization and reports on human rights abuses abroad

12   does not mean that Mr. Kurashev knew or intended that the funds he sent would "influence or

13   affect the conduct of government by intimidation or coercion, or to retaliate against government

14   conduct." *See id*. at 702. Rather, a desire to expose the human rights abuses of a government

15   reflects a desire to influence the public and the international community to step in and protect the

16   abused; even if the government argues that such activity eventually has the effect of changing

17   government conduct, is too attenuated to qualify under § 2332b(g)(5).

18   This does not mean that Mr. Kurashev did not commit a crime; doing the above violated §

19   2339B, which is why Mr. Kurashev pled guilty, but that does not satisfy the standard in 18 U.S.C.

20   § 2332b(g)(5). Moreover, the government cannot show by clear and convincing evidence that the

21   funds were actually transmitted to HTS, much less used by them for the specific purpose in §

22   2332b(g)(5).[1] As such, this enhancement should not be applied in this case.

23      *ii. Section 3A1.4 is unreliable.*

24   Regardless of whether § 2X1.1 or § 2M5.3 is utilized to calculate the offense level in an

25

26   _____

27   [1] As the defense has argued previously, the motorcycle with "Abu Salim" written on it is not clear and convincing
     evidence that Mr. Kurashev's funds were used to buy that motorcycle. As the government itself conceded in earlier
     filings, "abu" means father, and "Abu Salim" simply means "Salim's father." This nicknaming system is popular in
28   the Arab world, and the name Salim is very common throughout the Middle East and South Asia, as there are renowned
     historical figures and modern famous people bearing that name. Many people in multiple countries who viewed this
     contest likely used that nickname, and the government cannot and has not established otherwise.

Defense Sentencing Memorandum         *United States v. Murat Kurashev*, 21-40-KJM

attempted MST or MST case charged under 18 U.S.C. § 2339B(a)(1), the enhancement at U.S.S.G. § 3A1.4 obliterates any distinction between attempted and completed offenses and ignores differing levels of culpability and circumstance.  Anyone charged under 18 U.S.C. § 2339B(a)(1) – whether for attempt, as in this case, or for the completed offense – will have at least a base offense level of 26, to which this enhancement adds 12 points, resulting in a new offense level of 38 *at minimum*, which is nearly off the chart.  This also takes even people with zero criminal history points, like Mr. Kurashev, and increases their criminal history category to the top of the chart.  Therefore, it at minimum results in a guideline range of 360 months to life, which means the low-end of the guidelines is *a decade greater than the statutory maximum* of 20 years.  Even factoring in a three-level reduction for acceptance of responsibility results in a guideline range whose low-end is *more than four years higher than the statutory maximum* (VI / 35 = 292-365).

This is contrary to the express purpose of the guidelines, which is to assist judges in differentiating between different levels of culpability and liability by providing sentencing recommendations based on empirical data.  It also obliterates any benefit of accepting responsibility for one's criminal conduct as reflected in the guidelines.

This enhancement did not come into being as the result of empirical data, evidence on recidivism, or any data at all.  Until 1994, federal offenses involving terrorism fell under U.S.S.G. § 5K2.15, which simply provided, "[i]f the defendant committed the offense in furtherance of a terroristic action, the court may increase the sentence above the authorized guideline range."  *See* U.S. Sent. Guideline Manual (1990) at § 2K2.15, *available at* https://www.ussc.gov/guidelines/ archive/1990-federal-sentencing-guidelines-manual; *see also* Commentary to Amendment 292, Appendix C.

However, in 1994, Congress passed the Violent Crime Control and Law Enforcement Act of 1994 (VCCLEA), which *inter alia* directed the Commission to create an enhancement for offenses involving international terrorism, to wit, § 3A1.4, which first appeared in the 1995 version of the Guidelines.[2]  *See* PL 103–322, Sept. 13, 1994, 108 Stat 1796; *see also* U.S. Sentencing

---

[2] Specifically, this enhancement became effective November 01, 1995, pursuant to Amendment 526.  *See* https://www.ussc.gov/guidelines/guidelines-archive/2001-3a14.  Amendment 526's "Reason for Amendment" section

1  Guidelines (1995) at § 3A1.4, *available at* https://www.ussc.gov/guidelines/2015-guidelines-

2  manual/archive/1995-ch3web.   The VCCLEA was enacted despite the Commission's formal

3  expression of concern that the proposed enhancement was too rigid.  The Commission's "Analysis

4  of the Violent Crime Control and Law Enforcement Act of 1994 (H.R. 3355, As Passed by the

5  Senate November 19, 1993 and by the House April 26, 1994), Part II, June 8, 1994" said the

6  following about the mandate:

> As a general principle, the Commission has opted for a more flexible
> guideline departure, rather than a fixed guideline enhancement
> where a sentencing factor is atypical or when it may arise during the
> course of a wide range of offenses of varying seriousness or in many
> forms. In such situations it may be difficult to arrive at a fixed
> formula in calibrating the seriousness of the fact with that of the
> underlying offense, although the factor nevertheless may be an
> important sentencing consideration for the court.

*United States v. Graham*, 275 F.3d 490, 531 (6th Cir. 2001) (A. Cohn dissenting opinion).

Notwithstanding that concern, not only did Congress pass the VCCLEA, but years later,

amidst the climate of extreme fear immediately following two major terrorist attacks in the United

States, Congress passed two statutes, the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA") and the USA PATRIOT Act of 2001, which expanded the offenses that the new

terrorism enhancement applied to.  *See* AEDPA, Pub. L. 104–132, § 730 and U.S. Sent. Comm.

Amendment 539, Appendix C (passed as an emergency amendment, which was later

repromulgated without any changes in Amendment 565, Appendix C); *see also* USA PATRIOT

Act, Pub. L. 107-56 (2001).

In short, the Sentencing Commission created the enhancement pursuant to a Congressional

directive.  As the Supreme Court has stated, when the Sentencing Commission fails to fulfill "its

characteristic institutional role" of developing a particular guideline based upon empirical data,

national experience, or some other rational policy basis, the district court has the discretion to

---

states: "Section 120004 of the Violent Crime Control and Law Enforcement Act of 1994 directs the Commission to provide an appropriate enhancement for any felony that involves or is intended to promote international terrorism. The amendment addresses this directive by adding a Chapter Three enhancement at § 3A1.4 (International Terrorism) in place of the upward departure provision at § 5K2.15 (Terrorism)."

Defense Sentencing Memorandum                                          *United States v. Murat Kurashev*, 21-40-KJM

conclude that the resulting advisory range "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *United States v. Kimbrough*, 128 S. Ct. 558, 575 (2007); *see also Spears v. United States*, 129 S. Ct. 840, 843 (2009) (holding that when the Sentencing Commission fails to fulfill its institutional role, district courts may also vary from their guidelines "based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case.")

In such instances, the Court effects a proper separation of powers by choosing to disregard Guidelines provisions that were made by the Commission at the behest of Congress without an appropriate empirical basis. Congress was fully within their authority to amend the statute to implement a mandatory-minimum sentence for certain types of § 2339B cases, but they chose not to do so. Directing the Commission to create such a dramatic increase in the guidelines without a proper empirical basis not only seems to unconstitutionally circumvent the usual legislative process by creating a *de facto* mandatory minimum sentence (since, as detailed *infra* in Section II.E., it is applied in an astounding 96% of cases such as the instant one), but also severely undermines the confidence courts can usually place in the Guidelines as an appropriate starting point for their sentencing determinations.

In summary, the reason why the guidelines can usually serve as a persuasive argument for their proffered advisory sentence is that those who rely on them expect them to be developed using empirical data from past sentencing cases and to take into account any other relevant data-driven considerations. *See Rita v. United States*, 551 U.S. 338, 349 (2007). Such was not the case with the creation of the § 3A1.4 enhancement, and this critical failing was never corrected, as each subsequent amendment failed to evaluate the guideline using the empirical data approach or other rational basis. Indeed, the fact that the enhancement results in a low-end recommendation that is ten years above the statutory maximum (even after the statutory maximum was raised to its current level) belies any suggestion that the enhancement is driven by a rational review of past cases, recidivism, or other relevant factors.

/

//

**C. Section 2X1.1, not § 2M5.3, should be applied in *attempted* material support for terrorism cases.**

The indictment charges a sole count of attempting to provide material support for terrorism ("MST"), in violation of 18 U.S.C. § 2339B(a)(1). The Guidelines' application instructions refers courts to § 1B1.2 to determine which Chapter Two section to utilize for the offense conduct calculation. U.S.S.G. § 1B1.1(a)(1). Section 1B1.2 refers courts to Appendix A to determine the Chapter Two offense guideline, but the very next sentence qualifies that by expressly stating, "[i]f the offense involved a conspiracy, **attempt**, or solicitation, refer to § 2X1.1...." U.S.S.G. § 1B1.2(a) (emphasis added).

Mr. Kurashev was charged with and pled guilty to *attempted* MST, not MST (the latter of which is covered by § 2M5.3). Since he is charged with attempt, we are explicitly instructed to turn to § 2X1.1, which covers attempted offenses "not covered by a specific offense guideline." Application Note 1 to this chapter describes what the guidelines mean by "not covered by a specific offense guideline," and provides a list of offense guidelines that expressly cover attempts. U.S.S.G. § 2X1.1 A.N. 1. Section 2M5.3 is not included in that exhaustive list.

Notably, other sections in Chapter Two's Part M are included. *Id*. For example, that application note includes § 2M6.1 in the list of offense guidelines that expressly include attempt. Section 2M6.1 covers "Unlawful Activity Involving Nuclear Material, Weapons, or Facilities, Biological Agents, Toxins, or Delivery Systems, Chemical Weapons, or Other Weapons of Mass Destruction; *Attempt or Conspiracy*" (emphasis added). By contrast, § 2M5.3 is excluded from the list, and its title ("Providing Material Support or Resources to Designated Foreign Terrorist Organizations or Specially Designated Global Terrorists, or for a Terrorist Purpose") does not list attempt, as § 2M6.1 does.

Section 2X1.1(c)(1) further bolsters this guideline interpretation, as it states that the Chapter Two section covering the substantive offense should be used for an attempt charge when attempt is *expressly covered by another guideline section*.

In short, § 2M.3 does *not* expressly cover the charge in this case, and therefore the plain language of the guidelines directs us to utilize § 2X1.1 to calculate Mr. Kurashev's offense level.

Defense Sentencing Memorandum                    *United States v. Murat Kurashev*, 21-40-KJM

1   To do otherwise would be to frustrate the express language and purpose of the guidelines, which

2   carve out a separate method for dealing with attempt cases.  To ignore that and simply apply the

3   substantive guideline chapter here would effectively render a third of § 2X1.1 obsolete.  Finally,

4   ignoring this mandate and applying § 2M5.3 would treat Mr. Kurashev differently than the

5   guidelines explicitly call for, which would constitute a violation of due process.

6        Turning to § 2X1.1, the base offense level is the same as the base offense level from the

7   substantive offense of MST, which here would be +26.  However, § 2X1.1 only allows for the

8   addition of specific offense characteristics from the substantive offense's guideline section if those

9   adjustments "can be established with reasonable certainty."  U.S.S.G. § 2X1.1(a).  The application

10  notes to this section state that "the only specific offense characteristics from the guideline for the

11  substantive offense that apply are those that are determined to have been *specifically intended* or

12  *actually occurred*."  U.S.S.G. § 2X1.1 A.N. 2 (emphasis added).

13       Here, the government cannot establish with "reasonable certainty" that Mr. Kurashev

14  "specifically intended" to do anything listed in § 2M5.3(b)(1)'s specific offense characteristic, nor

15  can they establish with reasonable certainty that the conduct underlying the specific offense

16  characteristic actually occurred.

17       Mr. Kurashev admitted to the factual basis contained at ECF No. 146, which states:

18       Beginning no later than July 2020, and continuing to around
         February 2021, Mr. Kurashev, the defendant in this matter,
19       knowingly attempted to provide material support or resources, to
20       wit, money, to Farruk Fayzimatov, a fundraiser for Hayat Tahrir al-
         Sham (hereinafter "HTS").

21
         During the relevant time period of July 2020 to February 2021, HTS
22       was designated by the Secretary of State as a foreign terrorist
23       organization pursuant to the Immigration and Nationality Act § 219.

24       At the time of his offense, Mr. Kurashev knew that HTS:
             a.    Was a designated foreign terrorist organization as
25                 defined in 18 U.S.C. § 2339B(g)(6); or
26           b.    Has engaged or engages in terrorist activity, as
                   defined in INA § 212(a)(3)(B); or
27           c.    Has engaged or engages in terrorism, as defined in
                   the Foreign Relations Authorization Act (FY 1988 &
28                 1989) § 140(d)(2).

Defense Sentencing Memorandum                    *United States v. Murat Kurashev*, 21-40-KJM

> During the relevant time period of July 2020 to February 2021, Mr. Kurashev took a substantial step towards providing that material support or resources to HTS by sending money abroad using money transfer services located in Sacramento, California, which is in the Eastern District of California.

Nothing in this factual basis speaks to the provision of dangerous weapons, firearms, or explosives, nor to providing funds with the intent, knowledge, or reason to believe the funds would be used to purchase the foregoing, nor to funds or other material support provided with the intent, knowledge, or reason to believe they will be used to commit or assist in the commission of a violent act (the conduct specified in § 2M5.3(b)(1)).

While Mr. Kurashev admitted to providing funds to an individual who fundraised for HTS, that individual was also a media activist who was making videos detailing the human rights abuses that Russia and its allies were perpetrating against Syrian civilians. Terrorist organizations routinely carry out activities aside from the violent activities that first come to mind, such as the provision of social services, quasi-governance, and journalism.

Regardless of the purpose behind attempting to send funds to a terrorist entity, doing so violates U.S. law, but that does not mean one can infer that the sender's purpose was to support the type of conduct specified in § 2M5.3(b)(1). As such, a guilty plea to 18 U.S.C. § 2339B(a)(1) does not automatically mean that the defendant had the intent specified in § 2M5.3(b)(1). Furthermore, the evidence in this case is not sufficient to establish "with reasonable certainty" that Mr. Kurashev specifically intended his funds to be utilized in the matter specified in § 2M5.3(b)(1). Thus, his correct, partially-adjusted offense level (without acceptance of responsibility) is +26.

**D.    If § 3A1.4 is applied, the § 4A1.3(b) departure should also be applied.**

Mr. Kurashev has no criminal history (aside from the instant case) and therefore has zero criminal history points. However, if § 3A1.4 is applied, his criminal history will be calculated as a category VI. This would grossly overstate his criminal history within the meaning of § 4A1.3(b), as his "criminal history category [would] substantially over-represent[] the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(b)(1). The enhancement at § 3A1.4 is *not* based on studies of recidivism, nor

*United States v. Murat Kurashev*, 21-40-KJM

on relevant data of any kind, and Mr. Kurashev has never committed a crime before this case. By the plain text of the guidelines, he meets the requirements for a downward departure under § 4A1.3.

Many courts have utilized § 4A1.3 to depart downward in cases where § 3A1.4 applied, as the plain language of the departure provision allows them to do so. As one court reasoned:

> [N]o text within restricts or prohibits its application after the application of the § 3A1.4 enhancement.
>
> Several guidelines other than 3A1.4 prescribe specific criminal history categories such as: § 4B1.1 ("career offenders" are category VI); § 4B1.4 ("armed career criminals" are category IV at minimum); and § 4B1.5 ("repeat and dangerous sex offenders" are category V at minimum).
>
> Notably, § 4A1.3 explicitly restricts or prohibits its application in the event that one of these other guidelines apply. Specifically, § 4A1.3 prohibits a downward departure in the cases of armed career criminals under § 4B1.4 and repeat sex offenders under § 4B1.5, and limits downward departures to one category at most in the case of a career offender.
>
> Unlike with the other guidelines that specify a criminal history category, § 3A1.4 is listed nowhere in the guideline or its application notes. Without any prohibition or limitation, it is clear that the Commission did not intend to restrict a court's discretion with respect to criminal history downward departure under § 3A1.4.

*United States v. Benkahla*, 501 F.Supp. 2d 748, 758 (E.D. Va. 2007) (spacing added for clarity).

The Second Circuit agrees. As the *Meskini* Court reasoned, "[a] judge determining that § 3A1.4(b) over-represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes' always has the discretion under § 4A1.3 to depart downward in sentencing [via § 4A1.3]." *United States v. Meskini*, 319 F.3d 88, 92 (2003).

These courts are not alone in considering § 4A1.3's application in cases where § 3A1.4 has been applied. *See e.g. United States v. Muhtorov*, 329 F.Supp. 3d 1289, 1300-01 (D. Co. 2018) (decreasing criminal history category from VI to II); *United States v. Nayyar*, 2013 U.S. Dist. LEXIS 79002 at 22 (S.D.N.Y.) (varying downward from Category VI to Category I); *United States v. Aref*, 2007 U.S. Dist. LEXIS 17926 at 7-8 (N.D.N.Y.) ("even where the terrorism enhancement applies, a horizontal departure on criminal history is warranted under § 4A1.3(b) if a criminal

history category of VI substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes" and finding that, since the defendant had zero criminal history points, provided for his family via legitimate means until his arrest, and appeared to have not engaged in any criminal activity outside the instant case where § 3A1.4 was applicable, he was entitled to a downward variance from Category VI to Category I); *United States v. Thurston*, 2007 U.S. Dist. LEXIS 38185 at 53 (D. Or.) ("even if § 3A1.4 is deemed to apply and raises the defendants' criminal history category to VI, the court retains discretion to depart downward[; f]or example, the court may determine that a criminal history category of VI over-represents the serious of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes and depart downward under U.S.S.G. § 4A1.3").

**E.    Applying 18 U.S.C. § 3553(a), a sentence of eight years of incarceration is sufficient, but not greater than necessary.**

Mr. Kurashev plead guilty to the single count charged in the indictment, specifically, 18 U.S.C. § 2339B(a)(1).  The most current SRC data (covering the five years between fiscal years 2018 to 2022) shows there were 51 cases in that time period with a single count of conviction for 18 U.S.C. § 2339B.  *See* Exhs. A, B.[3]  This dataset reflects the following:

- Only 0.04% of people (2/51) had no criminal history points ("CRIMHIST") like Mr. Kurashev (regardless of whether their criminal history category was later increased by the terrorism enhancement ay U.S.S.G. § 3A1.4);

- In all but one case, the accused received a three-level reduction for acceptance of responsibility (the remaining case resolved post-trial).

- All but two people were in custody at the time of their sentencing ("PRESENT").

- About 14% (7/51) of people were either given probation only or split sentences (i.e. some prison time and some home confinement time).

- All[4] cases in this dataset utilized U.S.S.G. § 2M5.3 ("GDLINEHI") and reflects a base

---

[3] It should be noted that the "STATMAX" column, which documents the statutory maximum term of imprisonment in months, varies because this chart includes cases that were charged prior to the 2015 increase in the statutory maximum.  *See* USA FREEDOM Act of 2015, Pub. L. No. 114-23, tit. VI, §704, 129 STAT. 300 (increasing the maximum penalty from 15 years to 20 years).
[4] One case, whose USSC identifier is 2402757, reflects that § 2K2.1 was utilized and indicates a base offense level of

offense level of 26.  Of these 51 cases:

- Two cases[5] (0.04% of the total) indicate a court-determined, final offense level ("XFOLSOR") of less than 26, meaning that in these two cases, the terrorism enhancement at U.S.S.G. § 3A1.4 (which would add 12 points to the base offense level of 26, before subtracting the three points for acceptance of responsibility that all but one case received) was *not* applied;

- The remaining 49 cases (or in 96% of cases), the final offense level was at least 35, meaning the terrorism enhancement at § 3A1.4 was applied.

*See* Exhs. A, B.

In the 96% of cases where § 3A1.4 was applied, the guideline range skyrocketed to beyond the statutory maximum,[6] resulting in a guideline range that was the same as the statutory maximum.  *See* Exh. Y ("GLMAX").

Excluding the two cases where the § 3A1.4 enhancement was not applied (leaving a dataset of 49 cases), **the sentencing court imposed a sentence below the guideline range over 75% of the time**.  *See id.*  (comparing "STATMAX" and "SENSCAP" columns, indicating 37 of 49 cases had a below-guideline sentence).  As detailed *supra*, this data set has been cultivated to ensure the cases are very similar to Mr. Kurashev's case, which illustrates that, across the country, even courts who find § 3A1.4 applicable vary downward the overwhelming majority of the time.  The defendants in all the remaining cases (who received the statutory maximum) had criminal history, unlike Mr. Kurashev.[7]

Of the 49 cases where § 3A1.4 was applied, 19 carried the earlier statutory maximum of 180 months and the remaining 30 had the current maximum.  Analyzing the two groups separately:

---

18, even though it is a single count of conviction under 18 U.S.C. § 2339B.  This is presumably a typo in the SRC's data since that provision would never be used in such a case.  The chart reflects that the 2013 version of the Guidelines manual was utilized, which reflects the title of that section is the same as the current version, which relates to firearms.
[5] The USSC identifiers for these cases are 2473500 and 2440500.
[6] In 20 cases, the statutory maximum was 180 months, as they were charged prior to the FREEDOM Act.  The remaining 31 cases had the current statutory maximum of 240 months.
[7] The USSC identifiers for the cases that received the statutory maximum are: i) 2429347, 2440947, 2473803, 2425791, 2456033 (whose statutory maximum was 180 months); and ii) 2676539, 2375434, 2438261, 2544326, 2578803, 2548836, 2597893 (statutory maximum of 240 months).

■ 180-month statutory maximum cases:

    ○ Sentences fell in a wide range from 0 months of imprisonment (probation was imposed) to 180 months, including five cases where the sentence in the "SENSPCAP" column reflected the combined total of months of imprisonment plus months of home confinement imposed;[8]

■ 240-month statutory maximum cases:

    ○ Sentences fell in a wide range from 48 months to 240 months, including one case where the sentence in the "SENSPCAP" column reflected the combined total of months of imprisonment plus months of home confinement imposed;[9]

This data makes it clear that the guideline range in this case is not the appropriate sentence, particularly when considering the wide range of conduct that violates the statute of conviction.

Mr. Kurashev is a loving father of four small children, one of whom has significant special needs. While a term of imprisonment may be necessary to achieve relevant sentencing considerations, the defense's requested sentence is an extremely weighty one that constitutes a significant punishment that will take him away from his children's lives for a major portion of their childhoods; however, it also strikes the right balance under § 3553(a), because it will allow him to rejoin his family upon his release in time to be able to help support his minor children emotionally and financially.

As mentioned above, Mr. Kurashev was confined at the Sacramento County Jail for a significant period during the global COVID-19 pandemic, when conditions of confinement were particularly severe. The conditions of his confinement were egregiously dangerous, particularly in 2020 and 2021 when the pandemic was at taking lives at a record pace and the vaccine was not yet available to inmates. These conditions of confinement are not accounted for by the Guidelines and warrant special consideration under § 3553(a), further buttressing the propriety of a downward

---

[8] The sentences imposed (in months) were: 0, 20.72*, 30*, 40, 84, 88, 96, 120*, 120*, 120, 120, 120, 120, 150, 180*, 180, 180, 180, 180. Sentences marked with an asterisk reflect combined total of months of imprisonment plus months of home confinement imposed.

[9] The sentences imposed (in months) were: 102, 130, 132, 144, 144, 156, 180, 180, 180, 192, 210*, 236, 240, 240, 240, 240, 240, 240, 240. Sentences marked with an asterisk reflect combined total of months of imprisonment plus months of home confinement imposed.

1    variance.

2        Factoring in the relevant 18 U.S.C. § 3553(a) factors, including Mr. Kurashev's

3    tumultuous childhood; persecution and torture at the hands of Russian authorities; his inevitable

4    removal from the United States following his sentence (a weighty consequence not considered in

5    the guidelines, especially given the fact that he risks renewed persecution and torture if he is

6    returned to Russia); the severe circumstances of his pretrial incarceration during the global

7    pandemic; the fact that, prior to the events of this case, Mr. Kurashev did not incur any criminal

8    history; and the fact that he has a documented history of consistently providing for his family

9    through legal means, a below guideline sentence of eight years of incarceration is sufficient, but

10   not greater than necessary, to achieve all the relevant sentencing objectives.

11                          **III.  CONCLUSION.**

12       For the foregoing reasons, the defense respectfully moves the Court to impose the sentence

13   detailed above.

14                                  Respectfully submitted,

15                                  HEATHER E. WILLIAMS
                                    Federal Defender
16

17   Date: April 23, 2024           */s/  Christina Sinha*
                                    CHRISTINA SINHA
18                                  MEGAN T. HOPKINS
                                    Assistant Federal Defender
19                                  Attorneys for Defendant
                                    MURAT KURASHEV
20

21

22

23

24

25

26

27

28

Defense Sentencing Memorandum                    *United States v. Murat Kurashev*, 21-40-KJM